IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

MARGARET SEAMON,

                   Plaintiff,               OPINION AND ORDER

       v.                                07-cv-0588-bbc

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                   Defendant.

---

On June 1, 2002, plaintiff Margaret Seamon applied for Disability Insurance Benefits under Title II of the Social Security Act, codified at 42 U.S.C. §§ 416(i) and 423(d), alleging that she had been disabled from a variety of physical and mental impairments since January of that year. After winding her way through the administrative review process, in 2005 plaintiff filed an action for judicial review of the commissioner's final decision denying her application. On August 23, 2005, this court entered an order remanding the case to the commissioner on the following grounds: 1) the administrative law judge's decision failed to make clear why plaintiff's mental impairments limited her to having only "brief and superficial contact" with the public but had no effect on her ability to deal with supervisors or coworkers; and 2) the administrative law judge appeared to have to relied too heavily on

1

plaintiff's testimony concerning the cessation of her mental health treatment.  Seamon v. Barnhart, 05-C-013-C, Order, Aug. 23, 2005, dkt. #12 (adopting report and recommendation entered July 29, 2005, dkt. #11).

On March 28, 2007, after conducting a new hearing and obtaining additional medical evidence, the administrative law judge issued a decision finding that plaintiff was disabled as of October 6, 2006, but not before.  Plaintiff now seeks judicial review of the unfavorable portion of the administrative law judge's decision, arguing that the judge failed to comply with the court's remand order, failed to properly evaluate the evidence regarding her mental limitations, made an improper credibility determination and failed to ascertain whether the vocational expert's testimony was reliable.  In the alternative, she contends that the court should remand the case pursuant to sentence six of § 405(g) for consideration of a post-hearing letter by a consulting psychiatrist stating that plaintiff was disabled before October 6, 2006.  Because none of plaintiff's arguments convince me that the administrative law judge erred or that the outcome would change on remand, I am denying her motion for summary judgment and affirming the commissioner's decision.

The following facts are drawn from the administrative record.  Many of these facts are taken from the magistrate judge's report and recommendation in Seamon I, 05-C-013-C.

2

FACTS

I. <u>Background and Medical Evidence</u>

Plaintiff  was born on April 6, 1952, making her 49 years old at the time of her alleged onset date and 54 years old when the administrative law judge denied her claim for the second time.  She earned her GED in 1989 and has past relevant work experience as a floral designer, receptionist and general office clerk.   She last worked on January 29, 2002.

Plaintiff has suffered from depression and anxiety since at least 1994.  In addition, she was diagnosed with post traumatic stress disorder after having been in two car accidents in close succession in 1999.  (Plaintiff also has various physical concerns including cervical and lumbar degenerative disc disease, myofascial pain syndrome, left ankle instability, irritable bowel syndrome, asthma, obesity and right elbow tendinitis.  Because plaintiff does not contest the administrative law judge's evaluation of these impairments, I do not discuss them.)

In 2001, plaintiff saw Dr. Linda Kollross, a psychiatrist, who prescribed antidepressants and anti-anxiety medication.  On May 9, 2002, plaintiff began seeing a different psychiatrist, Dr. John Bartholow.  Plaintiff reported that although she was taking Xanax and Celexa, she was symptomatic and unhappy with her current response to the medications.  Plaintiff reported that although she had managed her symptoms adequately in the past, recent stressors, including a work-related injury and having been fired from

several jobs, had exacerbated her stress and anxiety.  She scored a 41 on a Beck Depression Inventory, placing her in the severe depression range.  Plaintiff acknowledged having suicidal thoughts but denied any active plan or intent.  Dr. Bartholow diagnosed plaintiff with major depressive disorder, recurrent; dysthymic disorder; anxiety disorder exacerbated by recent job-related stressors; and post traumatic stress disorder exacerbated by recent job-related stressors.  AR 407-410.

At a visit with Dr. Bartholow on August 23, 2002, plaintiff reported having a great deal of anxiety and feeling overwhelmed by her symptoms, although she denied hopelessness or suicidality.  Plaintiff presented disability papers.  Dr. Bartholow told plaintiff that "a big part of her disability at this time is due to pain from that work related injury" and that he could not support disability on the basis of psychiatric problems alone.  AR 391.  Dr. Bartholow recommended a trial of Depakote and lowering the dosage of Celexa.

On September 9, 2002, Richard E. Fuhrer, Ph.D., a clinical psychologist, conducted a clinical evaluation of plaintiff at the request of the local disability agency.  Dr. Fuhrer reported that plaintiff complained of chronic pain from a number of injuries including a right-sided back injury, foot and ankle injuries, arthritis in her knees, and of symptoms of anxiety, agoraphobia, post traumatic stress disorder and depression.  During his mental status examination, Dr. Fuhrer observed that although plaintiff was mostly pleasant in her manner, "she quickly escalates into a rage at those she feels have treated her unjustly,"

4

including former employers.  Plaintiff's mood appeared to be within normal limits, although plaintiff's husband reported that she could be happy one minute and very angry the next. Plaintiff reported low energy except for one "high energy" day a week during which she did excessive cleaning.  She said she felt worthless, had daily crying spells, was irritable, had memory problems and avoided everyone except her children.  Plaintiff's thought content was logical and goal-directed with no evidence of hallucinations or delusions, although she reported some suicidal thinking and episodes of rage during which she had homicidal urges. Dr. Fuhrer believed that plaintiff's short-term memory was below average and below expectation for her education, although he described it as "not terribly impaired." Concentration was within acceptable limits.  Plaintiff demonstrated fairly good insight and judgment.

Dr. Fuhrer diagnosed plaintiff with a non-specific mood disorder and gave her a score of 50 on the Global Assessment of Functioning Scale, indicating above-moderate to serious symptoms.  He concluded that plaintiff was able to understand, remember, and carry out simple instructions.  However, he found that

> It is more questionable whether she can respond appropriately to supervisors and co-workers at this point.  She does quickly escalate with rage.  Her ability to maintain concentration, attention, and work pace is likely somewhat impaired by depression and chronic pain.  Her ability to adapt to changes is likely poor.

5

AR 268.

On October 7, 2002, Dr. Fuhrer discussed the results of Seamon's scores on the Minnesota Multiphasic Personality Inventory-II ("MMPI-II") and Millon Clinical Multiaxial Inventory-III ("MCMI-III"). He mentioned that on the MMPI-II "she shows elevation on all of the clinical scales, including an extremely high score on the "schizophrenia" scale. He noted that on the MCMI-III, she showed extreme elevations on several scales including bipolar, anxiety disorder, drug dependence, post traumatic stress disorder, major depression, and negativistic and antisocial personality traits. He further stated that "the test data is of questionable validity due to an apparent tendency to overly emphasize symptoms and problems making it impossible to sort out any specific clinical patterns." He nonetheless concluded that plaintiff "certainly is expressing in effect that she is highly distressed and disturbed." AR 464.

Plaintiff continued treatment with Dr. Bartholow and participated in individual therapy with Scott Phillips until November 2002, when she became unhappy with their care. Phillips noted frequent anger, tangential and pressured speech and dramatic manner during their sessions. In October 2002, after observing plaintiff and listening to the level of distress she described, Phillips urged plaintiff to check herself into the hospital; plaintiff refused. Phillips observed that plaintiff had multiple risk factors for worsening psychiatric symptoms including abrupt medication discontinuation, chronic and acute pain, severe financial

concerns and personality traits that "encourage her to externalize her anger and frustration thereby reducing her possible responsibility for her current state as well as interfering with more proactive problem-solving." AR 381-82. In late October 2002, plaintiff called Phillips and abruptly ended her relationship with him, stating that she felt betrayed by him and that she had essentially called to ream him out.

On November 19, 2002, plaintiff saw Dr. Kollross. Plaintiff reported that she was unhappy with her previous therapist because he was unable clearly to diagnose her and she felt as if he had "betrayed her" in some of the notes. Plaintiff reported being on Depakote, Celexa and Xanax and reported that overall, she felt as if the medications had been helpful. Dr. Kollross diagnosed a mood disorder, non-specific, and a probable personality disorder. AR 413.

On December 13, 2002, plaintiff was admitted to the hospital after calling police and reporting that she was suicidal. On admission, plaintiff reported that she was feeling more depressed than usual and had impulsively taken some Neurontin tablets that she had at home. Plaintiff was diagnosed as having an agitated depressive episode. Hospital staff administered Remeron to ameliorate plaintiff's complaints of significant sleep problems and anxiety. Plaintiff was discharged on December 15, 2002, in improved condition. AR 521-26.

On December 18, 2002, Dr. Bartholow responded to a mental health questionnaire concerning plaintiff.  He reported her current diagnoses as major depressive disorder, recurrent dysthymia, anxiety disorder, post traumatic stress disorder and chronic pain most likely a pain disorder with associated medical and psychological problems.  He noted that plaintiff obsessed about chronic suicidality, and was very anxious, moody, labile and easily agitated.  Dr. Bartholow noted that plaintiff described dramatic depressive symptoms, including social withdrawal, isolation, dysphoria and a strong sense of hopelessness.  She described very frequent anxiety and panic attacks, thought about past events such as car accidents and "how she has been fired from several different jobs unfairly," and talked about her pain problems repeatedly.  Dr. Bartholow noted that although plaintiff professed an inability to function, she did not exhibit significant problems with dress, grooming or hygiene.  He reported regressive behaviors including plaintiff's inability to work, strong suspiciousness towards others, emotional reactivity and difficulty in relationships.  Dr. Bartholow reported that plaintiff's response to medication and psychotherapy "seems limited," and she was unlikely to improve given that she had been in similar treatment settings in the past.  The doctor found that because of plaintiff's difficultly with social interactions, "she would have a difficult time working both with work stress and tolerating supervision."  AR 428-29.

On February 4, 2003, state agency psychiatrist, Arden Mahlberg, Ph.D., reviewed the record and completed a Psychiatric Review Technique Form. He noted several categories of mental impairment, including affective disorder, anxiety-related disorder and personality disorder. AR 443. He concluded that plaintiff's impairments resulted in moderate limitation in restriction of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. AR 453. Dr. Mahlberg found that plaintiff had "moderate" limitations in several work-related mental skills. AR 439-440.

From February 16 to February 21, 2003, plaintiff again was committed as a mental inpatient after attempting to kill herself by overdosing on Remeron. Plaintiff reported that over the previous few weeks she had been extremely depressed and contemplated suicide. She reported that she had been unable to find a job and had problems trusting her psychiatrists, therapists and "the system." Plaintiff's medications were adjusted and her condition was significantly better at discharge.

Dr. Kollross managed plaintiff's medications until June 2003, at which time plaintiff began getting her medications from her primary physician, Dr. Robert Watson. After her February 2003 hospitalization, plaintiff did not seek any psychiatric or psychological treatment and she was not hospitalized for psychiatric problems.

On June 8, 2004, plaintiff told Dr. Watson's nurse that Celexa helped control her depression.  In the fall of 2004, Dr. Watson noted that plaintiff had a flare-up of symptoms in connection with her brother's death from prostate cancer.  AR 932.  On August 25, 2004, plaintiff went to the emergency room for complaints of difficulty breathing, anxiety and headache.  Emergency room staff noted that plaintiff was hyperventilating and acutely anxious but had no specific psychiatric complaints.  She was treated with medication and discharged.

On August 30, 2004, plaintiff told a physician's assistant that she had been trying to watch her diet and exercise more, reporting that she exercised about an hour and a half a week.  Plaintiff said she had stayed with her brother and his family over the spring and helped take care of him before he died.  AR 926.   On December 28, 2004, Dr. Watson noted that plaintiff had reduced her Celexa dosage from 60 to 40 milligrams, her anxiety and depression had gotten better and her main problem was her chronic myofascial pain.  AR 898.

In July 2005, plaintiff asked Dr. Watson if she could try a different anti-depressant because she had been gaining weight, which she attributed to the Celexa.  Dr. Watson started plaintiff on Prozac.  AR 880.  In July 2006, Dr. Watson noted that plaintiff's depression and anxiety were under reasonable control on her current medications. AR 1157. In October 2006, plaintiff told a new primary physician, Dr. Nordstrom, that she had mood

10

swings and cried frequently, although she denied feeling significantly depressed.  Plaintiff was concerned that her symptoms would increase in the winter, as they typically did.  Dr. Nordstrom observed that plaintiff was coherent and well-groomed, with an elevated mood and somewhat pressured speech at times.  He referred plaintiff to a psychiatrist for medication management.  AR 1192-1195.

On December 21, 2006, Paul Caillier, Ph.D., conducted a psychological evaluation of plaintiff at the request of her lawyer.  AR 1173-1178.  Plaintiff appeared for the clinical interview on time and was well-kept in appearance, cooperative and able to maintain adequate attention and concentration.  Her mood and affect were bright although she became agitated frequently during the interview and testing.  Caillier observed that plaintiff tended to be hysterical in terms of emotion and at times was argumentive and challenging.  Results of the MMPI-II indicated "a great deal of hypochondriasis and hysteria in her profile as well as a clear somatoform disorder" and indicated that plaintiff was extremely anxious, clinically depressed and had a great deal of internalized anger.

After reviewing plaintiff's medical records and the results of the MMPI and interviewing plaintiff, Caillier found that plaintiff suffered from a personality disorder, somatoform disorder and an affective disorder.  In Caillier's opinion, plaintiff's history showed that she was "gradually becoming more and more unstable over the years to the point where she is now unemployable."  He indicated that plaintiff's condition was severe

11

enough to satisfy the listings, explaining that plaintiff had marked restrictions in activities of daily living, social functioning and maintaining concentration, persistence and pace and several episodes of decompensation over the years.  In addition, he found that she would meet the "C" criteria of the listings because she had an affective disorder of at least two years' duration that had affected her ability to do work in more than a minimal way and that had resulted in a residual disease process.

## II.  Administrative and Court Proceedings

Plaintiff applied for disability insurance benefits on June 17, 2002, alleging that she had been disabled since January 1, 2002.  After the local disability agency denied her claim initially and on reconsideration, plaintiff exercised her right to a *de novo* hearing before an administrative law judge.  At the hearing on October 28, 2003, plaintiff testified that her mental condition was significantly better than it had been in 2002 and early 2003.  Plaintiff said she had stopped taking psychiatric medications except for Xanax and Celexa prescribed by her family doctor and stopped seeing a psychiatrist.  Plaintiff attributed the severity of her condition in 2002 and 2003 to the different medication regimes attempted by her psychiatrists and her inability to find a job.  Plaintiff was not represented by a lawyer at the hearing.

12

On April 30, 2004, Administrative Law Judge Roger Thomas issued a decision denying plaintiff's application.  He found that although plaintiff suffered from severe physical and mental impairments, she retained the residual functional capacity for certain types of work, namely unskilled, light jobs that did not require high production goals or more than brief, superficial contacts with the public.  Relying on the testimony of a vocational expert, he concluded that plaintiff was capable of making a vocational adjustment to such jobs and that such jobs existed in significant numbers in the national economy.

After the Appeals Council declined to grant plaintiff's request for review, plaintiff filed an action for judicial review in this court, which was referred to United States Magistrate Judge Stephen Crocker.  On July 29, 2005, the magistrate judge issued a report and recommendation that the case be remanded for the following reasons:   1) the administrative law judge's decision was "internally inconsistent" with respect to his finding that plaintiff's social limitations would affect only her ability to relate to the public and not supervisors or coworkers and there was nothing to explain the inconsistency; and 2) the administrative law judge appeared to have to relied too heavily on plaintiff's testimony concerning the cessation of her mental health treatment.  Seamon v. Barnhart, 05-C-013-C, dkt. #11, Rep. and Rec., July 29, 2005.  On August 23, 2005, after hearing no objections, I adopted the report and recommendation and entered an order remanding the case to the agency.

13

The case was reassigned to Administrative Law Judge Thomas.  He obtained additional medical evidence and held a new hearing, at which plaintiff was represented by counsel.  Plaintiff testified that she is often depressed and tearful.  She suffers frequent mood swings, is quick to become angry and has occasional panic attacks in stressful situations.  She said she has trouble finishing tasks once she starts them and has problems remembering things.  She takes generic Xanax and Prozac prescribed by her primary physician.  She said the medications had been helping but lately they were not.  She had recently started seeing a new doctor, who had encouraged her to see a psychiatrist.

The administrative law judge called Sydney Bauer, a neutral vocational expert, to provide testimony.  The administrative law judge asked Bauer hypothetically whether a person of plaintiff's age, education and work experience who was limited to light work with various postural limitations, no exposure to high concentrations of air pollutants, no work around hazardous machines, no high production goals and only "brief, superficial contacts with others" could perform any of plaintiff's past work.  AR 1265.  Bauer answered in the negative, explaining that all of plaintiff's past jobs involved more than brief and superficial contact with others.  She testified, however, that such a person could perform the job of brusher in the boot-shoe industry or work as a cafeteria attendant.  According to Bauer, 1,500 brusher jobs and 8,250 cafeteria attendant jobs existed in Wisconsin.

On cross-examination, plaintiff's attorney asked Bauer to provide the numbers from the <u>Dictionary of Occupational Titles</u> that corresponded with each job; Bauer provided them. Regarding the various "moderate" limitations found by the state agency physicians, Bauer testified that if "moderate" meant that a person could perform the particular task only 80-90 percent of the workday, competitive employment was likely not possible. In response to a question posed by plaintiff's lawyer, the administrative law judge indicated that his hypothetical limitation to brief and superficial contact with "others" included the public, supervisors and coworkers. Neither the administrative law judge nor plaintiff's lawyer asked Bauer to substantiate her testimony concerning the numbers of jobs that were available.

The administrative law judge issued a partially favorable decision on March 28, 2007, finding that plaintiff was disabled as of October 6, 2006 (the date she was considered an individual of "advanced age," see 20 C.F.R. § 404.1563), but not before. In reaching this decision, he again found that plaintiff retained the residual functional capacity for a limited range of light, unskilled work. As in his first decision, he found that plaintiff's mental limitations required a job that did not have high production goals. He also found that plaintiff could not have more than brief, superficial contact with "others" in the workplace.

Relying on the vocational expert's testimony, the administrative law judge found that plaintiff was unable to perform the jobs she had performed in the past because they required

15

more skill and social contact than allowed by the residual functional capacity determination. As required by the regulations, he then proceeded to consider whether plaintiff was able to perform other work existing in significant numbers in the national economy in light of her residual functional capacity, age, education and work experience. With respect to plaintiff's age, the administrative law judge observed that when plaintiff turned 55 on April 6, 2007, she would move from the category of "closely approaching advanced age" (age 50-54) to the "advanced age" category (55 and older). This was a dispositive event: under the Medical-Vocational guidelines at 20 C.F.R., Pt. 404, Subpt. P, App. 2 (commonly known as the "grids"), an individual of "closely approaching advanced age" with no transferable skills and a residual functional capacity for light work is deemed "not disabled," Rule 202.14, whereas a similar individual of "advanced age" is deemed disabled. Rule 202.06. Noting that the commissioner's regulations prescribe that the age categories are not to be applied mechanically to deny benefits in "borderline" situations, 20 C.F.R. § 404.1563(b), the administrative law judge stated that he would consider plaintiff to be of advanced age six months before her 55th birthday, or on October 6, 2006, and disabled as of that date. (This was a significant break for plaintiff, whose eligibility for Disability Insurance Benefits expired on December 31, 2006.) For the preceding period, however, he found that plaintiff was not disabled. Relying on the vocational expert's testimony, he found that plaintiff was capable

16

of making a vocational adjustment to jobs existing in significant numbers in the national economy, namely, brusher in the boot-shoe industry (1,500 jobs) and cafeteria attendant (8,250 jobs).

In reaching his conclusions about plaintiff's mental limitations, the administrative law judge carefully reviewed the medical evidence. He explained that plaintiff was functioning well on medication through mid-2002, at which time she became more symptomatic and had two in-patient hospitalizations. Even assuming plaintiff's condition during that time period was severe enough to be disabling, he explained, it did not meet the 12-month durational requirement for a finding of disability. The administrative law judge observed that after plaintiff stopped going to psychiatrists and counselors in 2003, her mental health had improved. In support of this conclusion, the administrative law judge cited not only plaintiff's testimony but also several medical records from 2004 to 2006 noting that plaintiff had told her primary physician that her symptoms of anxiety and depression were doing reasonably well on the medications that he was prescribing. With respect to his mental residual functional capacity finding, the administrative law judge explained that it was consistent with Dr. Bartholow's statement on the January 6, 2003 questionnaire that plaintiff "would have a difficult time working both with work stress and tolerating supervisions [sic]."

Addressing Caillier's December 2006 evaluation, the administrative law judge wrote:

> Since the undersigned has already found the claimant disabled as of October 6, 2006, based on the combination of her impairments resulting in the residual functional capacity outlined above, he will make no separate determination of disability solely on the basis of the claimant's mental impairments. However, Dr. Caillier's opinion of disability as of December 2006 is not inconsistent with the ultimate decision in this case.

AR 725.

Plaintiff requested the Appeals Council to review the unfavorable portion of the administrative law judge's decision. In support of her request, she submitted an April 10, 2007 letter from Caillier in which he stated that the administrative law judge had misunderstood his December 21, 2006 report. Caillier stated that, contrary to the administrative law judge's understanding, his opinion was *not* that plaintiff became disabled in December 2006, but rather that she was disabled as of January 25, 2002. He explained that this was the date of the last note from Dr. Steven Cook, wherein Cook wrote that plaintiff was suffering from panic disorder, post traumatic disorder and significant anxiety and was undergoing five or six crises in her life that were overwhelming her. Caillier explained that "[f]rom that time forward, [plaintiff] was unable to find a job, which was primarily based on mental disorders." Dkt. #10, Exh. A. The Appeals Council declined to assume jurisdiction over plaintiff's case, making no mention of Caillier's letter in its order. AR 688.

18

OPINION

I. <u>Sentence Six Remand</u>

Plaintiff requests a remand under sentence six of § 405(g) for consideration of Caillier's post-hearing letter.  (Plaintiff also argues that I should find that the Appeals Council erred in failing to consider whether Caillier's April 2007 letter was new and material. Because plaintiff raised this issue for the first time in her reply brief, I do not consider it. <u>See</u>, <u>e.g.</u>, <u>United States v. Adamson</u>, 441 F.3d 513, 521 n.2 (7th Cir. 2006) (arguments raised in reply brief for first time are waived).)  To be entitled to a remand under sentence six, plaintiff must show that "there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." "'New' evidence is evidence 'not in existence or available to the claimant at the time of the administrative proceeding.'"  <u>Sample v. Shalala</u>, 999 F.2d 1138, 1144 (7th Cir.1993) (quoting <u>Sullivan v. Finkelstein</u>, 496 U.S. 617, 626, (1990)).  A medical report or evaluation based on existing evidence that was part of the record at the time of the hearing is not "new." <u>Jens v. Barnhart</u>, 347 F.3d 209, 214 (7th Cir. 2003); <u>Perkins</u>, 107 F.3d at 1296; <u>Sample</u>, 999 F.2d at 1144.  Evidence is material if it gives rise to a "reasonable probability" that the commissioner would have reached a different conclusion had the evidence been considered. <u>Perkins v. Chater</u>, 107 F.3d 1290, 1296 (7th Cir. 1997).  To be material, new evidence must

19

relate to the claimant's condition "during the relevant time period encompassed by the disability application under review." <u>Kapusta v. Sullivan</u>, 900 F.2d 94, 97 (7th Cir. 1990).

It is unnecessary to decide whether plaintiff meets the requirements of newness and good cause because Caillier's April 2007 letter is not material. As an initial matter, the administrative law judge was entirely reasonable in reading Caillier's December 2006 report as an assessment of plaintiff's current functioning as opposed to a retrospective assessment. Plaintiff asserts that it should have been clear from Caillier's statement regarding the "C" criteria and his examination of past records that "his analysis was focused from 2002 backwards," but her own assertion about what Caillier's focus was does not make it so. In particular, Caillier never proposed any date on which plaintiff's condition became disabling, reviewed records both before and *after* 2002 and stated only that plaintiff's condition had deteriorated to the point where "she is *now* unemployable." AR 1178 (emphasis added). (If the point of having Caillier evaluate plaintiff was to establish an earlier onset date, then one wonders why plaintiff's lawyer did not ask Caillier to make that date clear in his report.)

In any event, Caillier's April 2007 statement does not give rise to a reasonable probability of a different outcome. His opinion that plaintiff was disabled as of January 25, 2002 was founded largely on his opinion that from that time forward, plaintiff was "unable to find a job, which was primarily based on mental disorders." However, the fact that

plaintiff had no success finding a job does not mean that plaintiff was *incapable* of working. Further, Caillier cites no support for his conclusion that plaintiff's mental disorders were the reason she could not get a job. Caillier also mentioned that plaintiff was undergoing several crises in her life at that time, but that is another piece of evidence that says little about her ability to work.

More important, the administrative law judge acknowledged that plaintiff had had a difficult time in mid-2002 and early 2003 and that her impairments might even have been disabling at that time. However, he found that plaintiff improved after her second hospitalization and that her mental condition remained relatively stable from then until the date of the hearing. Nothing in either of Caillier's statements indicates that he considered these latter records or the evidence of plaintiff's improvement.

In sum, because Caillier's assessment of plaintiff's onset date is based upon a selective review of the evidence and not on the record as a whole, it provides at best weak support for plaintiff's claim. It is not likely to change the outcome. Accordingly, there is no reason to remand this case under sentence six.

II. Challenges to Administrative Law Judge's Decision

The standard by which a federal court reviews a final decision by the commissioner is well settled: the commissioner's findings of fact are "conclusive" so long as they are

supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts, reweigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge regarding what the outcome should be. Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the commissioner. Edwards v. Sullivan, 985 F.2d 334, 336 (7th Cir. 1993). To permit informed review, the administrative law judge must "build a logical and accurate bridge from the evidence to his conclusion" by "articulat[ing], at some minimum level, her analysis of the evidence." Dixon v. Massanari, 270 F.3d 1171,1177 (7th Cir. 2001).

Plaintiff contends that the administrative law judge failed to follow this court's remand order by "failing to properly incorporate all of plaintiff's limitations" into the mental residual functional capacity assessment. Although plaintiff's argument is difficult to follow, she appears to be arguing that in its remand order, this court indicated that plaintiff's "restriction to interaction with co worker [sic], supervisors and the public was more than moderate." Plt.'s Mem. in Sup. of Summ. Judg., dkt. #10, at 27. Plaintiff is incorrect. The court never offered any opinion as to the degree of plaintiff's mental limitations. The reason

22

it remanded the case was merely because there was no discernible reason for the distinction the administrative law judge appeared to have drawn between plaintiff's ability to relate to coworkers and supervisors versus the public. In his second decision, the administrative law judge corrected this flaw, finding that plaintiff was limited to jobs that required only brief and superficial contact with "others" in the workplace, not merely members of the public. Plaintiff's contention that the administrative law judge failed to comply with the remand order is unfounded, if not disingenuous.

Plaintiff's remaining objections to the administrative law judge's residual functional capacity finding amount to an argument that the administrative law judge did not properly weigh the evidence, an argument foreclosed by the deferential review standard. Having reviewed the record and the administrative decision in light of plaintiff's objections, I am satisfied that the administrative law judge set forth the evidence accurately and drew reasonable conclusions therefrom. Significantly, apart from Caillier's report (as allegedly clarified by his April 2007 letter), plaintiff fails to point to any evidence that calls into question the administrative law judge's finding that plaintiff's mental condition improved after her second hospitalization and remained relatively stable from then up through the date of the hearing. Plaintiff emphasizes the records from mid-2002 to 2003 but ignores the remainder of the record, which adequately supports the administrative law judge's findings. Overall, the administrative law judge's decision is accurate, thorough and well-reasoned. The

23

fact that a different fact finder reasonably could find plaintiff disabled on the basis of the same evidence is not a basis for reversal.

Plaintiff's challenge to the administrative law judge's credibility assessment is equally unpersuasive.  Contrary to plaintiff's assertion, the administrative law judge articulated in great detail why he found plaintiff's statements regarding the degree of her limitations to be less than credible.  With respect to her mental limitations, the administrative law judge acknowledged that plaintiff's symptoms were severe in late 2002 and early 2003, but improved in 2003.  In support of this finding, the administrative law judge noted that plaintiff had testified that she was better than she had been when she had been seeing a psychiatrist, and he cited several medical notes from the medical records that corroborated plaintiff's statement.  He also noted that plaintiff's testimony that the Prozac was ineffective was inconsistent with the record, which showed that she had taken the medication for more than two years without reporting a lack of benefit.  Earlier in his decision, the administrative law judge observed that none of plaintiff's mental health providers had found a complete inability to function as a result of mental impairments.  This evidence (and  more) reasonably supports the administrative law judge's determination that to the extent plaintiff alleged a complete inability to work, her allegations were not credible.

Plaintiff argues that the vocational expert's testimony fails to provide adequate support for the administrative law judge's conclusion that a substantial number of jobs exist

in the regional economy that plaintiff can perform.  First, she contends that the administrative law judge's hypothetical question was incomplete because it omitted any limitation on plaintiff's ability to maintain, concentration, persistence and pace.  Pointing out that the administrative law judge found plaintiff to have "moderate" limitations in this area, plaintiff proposes that "moderate" means that she could not consistently perform a job 100 percent of the time, which would preclude competitive employment.  Plaintiff cites no evidence to support her assertion that a person with "moderate" limitations in concentration, persistence and pace can meet only 80 percent of her employer's expectations.  Certainly, a person with such moderate limitations could not perform *all* jobs, such as those requiring a high degree of skill, concentration or speed.  However, the administrative law judge eliminated those types of jobs when he found that plaintiff was limited to unskilled work requiring no high production goals.  Accordingly, his hypothetical was complete.

Second, plaintiff argues that the vocational expert failed to substantiate her estimates of the number of brusher and cafeteria attendant jobs that existed.  The Court of Appeals for the Seventh Circuit has held that any data or reasoning underlying the vocational expert's bottom line must be "'available on demand'" so that the claimant may test the reliability of the expert's testimony.  McKinnie v. Barnhart, 368 F.3d 907, 910-11 (7th Cir. 2004) (quoting Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002)).  See also Britton v. Astrue, 521 F.3d 799, 803 (7th Cir. 2008) (suggesting ways plaintiffs may obtain data

25

underlying expert's testimony without making hearing impossibly long).  However, plaintiff did not make any demand for the underlying data.  Accordingly, she has waived any argument that the expert's numbers were unsubstantiated.  Donahue, 279 F.3d at 447 ("Raising a discrepancy only after the hearing . . .  is too late.").

Finally, plaintiff argues speciously that the vocational expert's testimony conflicts with the Dictionary of Occupational Titles because the jobs of brusher in the boot and shoe industry and cafeteria attendant require more contact with people and more overhead reaching than allowed by the residual functional capacity assessment.  Contrary to plaintiff's representation, the Dictionary indicates that interaction with people is "not significant" for either job and does not specify the amount of overhead reaching required.  Accordingly, the expert's testimony is not in conflict with the information provided in the Dictionary.

26

ORDER

IT IS ORDERED that the motion of plaintiff Margaret Seamon for summary judgment is DENIED.  The decision of defendant Michael J. Astrue, Commissioner of Social Security, denying plaintiff's application for disability insurance benefits for the time period before October 6, 2006 is AFFIRMED.

Entered this 19th day of August, 2008.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge